**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, AS NOMINEE OF LIFE PARTNERS POSITION HOLDER TRUST, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> PHL VARIABLE LIFE INSURANCE COMPANY, <br><br> Defendant. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Advance Trust & Life Escrow Services, LTA, as nominee of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant PHL Variable Life Insurance Company, states as follows:

**NATURE OF THE ACTION**

1.      This is a class action brought on behalf of Plaintiff and similarly situated owners of life insurance policies issued by PHL Variable Life Insurance Company ("Phoenix"). Plaintiff seeks to represent a class of Phoenix policyholders who are being subjected to an unlawful and excessive cost of insurance ("COI") increase by Phoenix in violation of their insurance policies.

2.      This COI increase represents the newest attempt by Phoenix to financially abuse its policyholders and induce lapses. Phoenix and its New York sister company Phoenix Life Insurance Company ("Phoenix NY") first implemented a COI increase in 2010 on a subset of Phoenix Accumulator Universal Life ("PAUL") policies.  The New York Department of Financial Services, California Department of Insurance, and the Commissioner of Insurance for the State of Wisconsin concluded that that 2010 increase was illegal.

1

3.      Undeterred, Phoenix and Phoenix NY then announced a second COI increase in 2011, also on a subset of PAUL policies.  A class action lawsuit was filed by plaintiffs represented by the undersigned law firm, over both the first and the second increases (the "*Phoenix I*" action), which Phoenix and Phoenix NY ultimately settled for more than $130 million in monetary and non-monetary benefits. *See generally Fleisher, et al. v. Phoenix Life Ins. Co.*, *et al.,* Case No. 11-CV-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) (order approving class action settlement). Among the prospective relief agreed to by Phoenix and Phoenix NY was a COI rate increase freeze, in which Phoenix and Phoenix NY agreed not to increase the COI rate schedule any further on class members through and including December 31, 2020.  The release in that settlement specifically carved out and "does not include any future COI rate adjustments assessed by" Phoenix.

4.      In June 2016, Phoenix and Phoenix NY were sold to a private equity firm, Nassau Reinsurance Group Holdings, L.P. ("Nassau Re"), with the "immediate priorit[y]" of "improving the company's profitability."  Fourteen months later, in August 2017, Phoenix and Phoenix NY sent cryptic letters to policyholders notifying them of a new, third COI rate increase (the "2017 COI Increase") on "certain Phoenix Accumulator Life and Phoenix Estate Legacy policies," including to the settlement class for the *Phoenix I* settlement.   The amount of the new COI rate increase and the actuarial justifications for it were not disclosed.  Phoenix disclosed only that "[t]here will be an overall increase to cost of insurance rates, as well as progressive increases to cost of insurance rates beginning when an insured reaches age 71 through age 85."

5.      Subsequent disclosures and investigation reveals that the 2017 COI Increase is being implemented in three stages:  (1) on the first policy anniversary following November 5, 2017 for certain PAUL and Phoenix Estate Legacy ("PEL") policies that were not part of the

*Phoenix I* settlement class, (2) "after December 31, 2020" for policies that were part of the *Phoenix I* settlement class, and (3) for other policy owners, Phoenix will impose the 2017 COI Increase on December 31, 2020 but then rebate to those policyholders the amount of the increase.

6.      This new 2017 COI Increase is unlawful.  Under the terms of the policies at issue (the "Subject Policies"), any change in COI rates must be "on a basis that does not unfairly discriminate within any class of insureds" and "on a uniform basis for all insureds in the same class."   The Subject Policies do not have a distinct "age 71 to 85" class, nor do they have separate classes for each of age 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, and 85.  The 2017 COI Increase therefore violates the contractual uniformity requirement inasmuch as (a) policyholders aged 71 and older are being targeted and treated differently than policyholders younger than 71 and (b) policyholders aged 72 and older are being progressively targeted each year as they age and discriminated against relative to younger policyholders (i.e., 72 year olds were hit with greater increases than 71 year olds, 73 year olds were hit with greater increases than 72 year olds, 74 year olds were hit with greater increases than 72 year olds, etc.).  Phoenix further violated the uniformity requirement by entering into special side-deals with certain large institutional investors, as discussed further herein, that had the economic effect (through rebates) of rendering the 2017 COI Increase inapplicable but only as to them.

7.      The 2017 COI Increase violates the Subject Policies in other ways as well.  Each of the policies mandates that any COI increase be based on Phoenix's expectations for specific enumerated factors such as mortality, persistency, investment earnings, and expenses. The Subject Policies further mandate that any change in rates be calculated prospectively and proscribes any recoupment of prior losses through a COI increase.  Finally, the implied covenant

of good faith and fair dealing mandates that any redetermination be conducted in good faith, on the basis of reasonable actuarial assumptions, and in compliance with actuarial standards. The 2017 COI Increase violates each of these covenants, as discussed in greater detail below.

8.    Notably, Phoenix is imposing the 2017 COI Increase on policies that were issued as recently as 2014. There is nothing that has changed between 2014 and 2017 that would merit a new COI rate increase. Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year, and 5-year treasury rates are now higher than they were in 2014.

9.    Tellingly, Phoenix NY did **not** implement the new 2017 COI Increase despite the fact that it issued identical PAUL and PEL policies. This is because Phoenix NY is regulated by the New York Department of Financial Services ("NYDFS"), which has recently become an active regulator in monitoring unlawful COI increases. Indeed, the reason that Phoenix NY is held separately from Phoenix is to keep Phoenix's activities outside the purview of NYDFS. Phoenix NY only issues policies in New York, while Phoenix issues the same type of policies in all other states (but not New York) though insureds on some Phoenix policies are New York residents.

10.    When the NYDFS learned of the 2017 COI Increase it proactively reached out to The Phoenix Companies, Inc.'s[1] Vice President for Insurance Regulatory and Government Affairs, who assured the NYDFS that "we are not doing one out of PLIC [i.e., Phoenix NY]" and said "I will confirm that there are not NY policyholders in the PHL class." The only possible explanation for treating Phoenix NY's PAUL and PEL policies differently than Phoenix's PAUL and PEL policies is that Phoenix and Phoenix NY knew that the COI increase was not legally or

---

[1] Phoenix and Phoenix NY are both owned and controlled by The Phoenix Companies, Inc.

actuarially justifiable and that NYDFS would find it to be unlawful. And to the extent that Phoenix exempted New York policyholders from the 2017 COI Increase, this would be yet another violation of the prohibition against intra-class discrimination.

11.    Phoenix's conduct is particularly egregious because it is targeting elderly insureds who have few, if any, options for replacement insurance. It is also targeting life settlement investors, who provide much needed liquidity for policyholders who no longer need their policies. The 2017 COI Increase was designed with the specific intent of inducing the lapse of policies on elderly insureds and those held by investors.

## THE PARTIES

12.    Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco Texas 76711. Plaintiff Advance Trust & Life Escrow Services, LTA, is suing in its capacity as nominee of Life Partners Position Holder Trust and is the owner of the following PAUL life insurance policies that were issued by Phoenix and are subject to the 2017 COI Increase:

- Policy #48596 (Issue Date: 10/31/2005; Face Amount $5,000,000)

- Policy #48597 (Issue Date: 10/28/2005; Face Amount $5,000,000)

- Policy #56867 (Issue Date: 8/25/2006; Face Amount $5,000,000)

- Policy #58113 (Issue Date: 6/26/2006; Face Amount $8,000,000)

- Policy #60948 (Issue Date: 2/16/2006; Face Amount $1,000,000)

- Policy #60949 (Issue Date: 2/16/2006; Face Amount $1,000,000)

- Policy #60951 (Issue Date: 2/16/2006; Face Amount $3,000,000)

- Policy #60998 (Issue Date: 12/27/2006; Face Amount $2,500,000)

- Policy #62454 (Issue Date: 10/23/2006; Face Amount $5,000,000)

- Policy #65940 (Issue Date 4/17/2007; Face Amount $4,500,000)

- Policy #66655 (Issue Date 9/12/2015; Face Amount $3,000,000)

Each of the above policies remains in force.

13.    Defendant Phoenix is a corporation organized and existing under the laws of Connecticut and has its statutory home office at One American Row, Hartford, CT 06115. Phoenix's senior officers, however, work out of Nassau Re's headquarters at 450 Park Avenue, 24th Floor, New York, New York 10022.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  Phoenix is incorporated and has its statutory home office in Connecticut.  Plaintiff is a citizen of Texas, and unnamed class members are citizens of states across the United States.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

15.    This Court has personal jurisdiction over Phoenix because the decision to increase COI rates was made in New York, and the uniform letters announcing the COI Increase were all sent on Phoenix letterhead listing a New York address for Phoenix. The letterhead announcing the COI Increase refers to Phoenix as "A Nassau Re Company" and lists a New York return mailing address for Phoenix.  Nassau Re's principal place of business is in New York, New York. In merger documents filed with Connecticut regulators, Nassau Re lists "450 Park Avenue, 24th Floor, New York, New York 10022" as the address for Nassau Re and for all affiliated Nassau companies. The merger documents further state that Nassau Re is "focused on … operating" the life insurance platforms that it acquires.  Indeed, Phoenix's two most senior

officers and the signatories on its Annual Statements—President Philip Gass and Vice President and Secretary Kostas Cheliotis—are the CEO and COO, respectively, of Nassau Re, and work in Nassau Re's New York office, and Phoenix employees use "@nsre.com" email addresses. Accordingly, while Phoenix maintains a statutory home office in Connecticut for regulatory purposes, its senior executives are located in and all major decisions, including the decision to raise COI rates on the Subject Policies, are made from Nassau Re's New York City headquarters.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiff's causes of action occurred in this District, including Phoenix's COI rate overcharge.

## FACTUAL BACKGROUND

### A.    The Policies at Issue

17.    The policies at issue are all flexible-premium, universal life ("UL") policies issued by Phoenix.  The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense that a policyholder pays.  The COI charge is deducted from the Policy Account (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Phoenix. Any premiums paid in excess of COI charges and expense components are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value."  These excess premiums earn interest.  This structure is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments.  Depending on

the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay COI charges and grow the account value.

18.    The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduces the amount of money on which interest can be earned.  Absent a secondary guarantee, once a policy account value diminishes such that COI charges can no longer be deducted and after the appropriate time expires after Phoenix provides an accurate and adequate grace notice, a policy will lapse unless additional premiums are paid in.

19.    Each of the Subject Policies has substantively identical language regarding how the COI rates will be determined.  One set of policies provides:

- COI "rates will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions."

- "We review our Cost of Insurance rates periodically, and may re-determine Cost of Insurance rates at such time on a basis that does not discriminate unfairly within any class of insureds."

- "Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates."

20.    A second set of policies provides:

- "Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation."

- "Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates."

- "Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs."

21.    With respect to a third set of policies, Phoenix told regulators that "Any change in flexible factors will be based on a change in future expectations for such factors as capital requirements, investment earnings, mortality, taxes, persistency and expenses. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in either insured's health or occupation. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates."

22.    The policies at issue are all form policies, and insureds are not permitted to negotiate different terms.  They are all contracts of adhesion.

23.    Phoenix NY's corporate representative testified at her Rule 30(b)(6) deposition: "[A]ll PAUL IIc policies [were] considered together for purposes of determining their non-guaranteed charges or benefits," and "[a]ll of PAUL IIc was a class at the time the initial non-guaranteed charges or benefits were determined." *Fleisher*, Dkt. 212-1 at 22 (quoting pages 249:23-250:8 of Day 1 of Phoenix NY's 30(b)(6) deposition). This logic applies to all Phoenix PAUL and PEL products.  By Phoenix's own deposition testimony, Phoenix considered all policies issued on a product line to form a class.

**B.    Phoenix's Prior COI Increases**

24.    In March 2010, Phoenix and Phoenix NY announced a COI rate increase (the "2010 COI Increase").  This 2010 COI Increase was effective on policy anniversaries beginning

April 1, 2010, and applied only to PAUL IIc and III policies, but not all of them — only those with issue ages of 68 and higher and face amounts of $1 million and higher. For policies subjected to this increase, Phoenix explained the magnitude of the COI rate increase would be based on the accumulated policy value. If the accumulated policy value was at or above a certain unspecified "threshold," the policyholder could avoid an increase by making sure the accumulated policy value did not fall below this unidentified amount. If the accumulated policy value was below this "threshold" the increase would be imposed. Thus, policyholders could avoid the COI rate increase if their accumulated policy value was maintained at a sufficient level (such level being the unspecified "threshold" amount). Phoenix was, in other words, punishing policyholders for exercising their contractual rights to minimally fund the policies.

25.    The 2010 COI Increase was explicitly designed to target investor-owned owned and induce policy lapses by making policies unprofitable. Before announcing the increase, Phoenix had engaged in a years-long process of redefining the policy classes to improperly target such policies. Phoenix's motivation for such targeting is that life settlement investors generally (a) tend to minimally fund their policies, because they can earn greater returns elsewhere, and (b) keep their policies in force. Ironically, Phoenix marketing materials expressly promote premium flexibility, and keeping policies in force is the only way to actually obtain the benefit of life insurance.

26.    In a September 6, 2011 letter, after more than a year of letters, meetings, and requests for more information from Phoenix NY, the NYDFS found:

> no language in the policy that states that Phoenix will take into consideration a funding ratio of the policy's accumulated value to the face amount when adjusting COI rates. In addition, the change made to COI rates based on the new formula using the funding ratio is contrary to the language in the policy that any change in rates will be made on a uniform basis for all insureds in the same class. The change in COI rate varies from policy to policy based on the funding ratio.

Therefore, by increasing COI rates in a manner that is inconsistent with the terms of the Accumulator UL II, Phoenix violated Insurance Law §3201.

Furthermore, NYDFS required Phoenix NY to rescind the COI rate increase restoring New York policies to appropriate value as if the COI rate increase did not occur.

27.    The California Department of Insurance ("CDOI") reached the same conclusion. On June 21, 2013, the CDOI informed Phoenix it had found "the COI rate increase is unfairly discriminatory in violation of California Insurance Code section 790.03f" and "the rate increase violates the express terms of the 05PAUL policy."   Accordingly, the CDOI informed Phoenix that it "should cease using the 2010 COI rating methodology" and "must: (1) reduce the COI rate for the affected policies to the COI rate that was in effect prior to the increase; and (2) not use funding ratio as a basis for determining the allocation of COI rates among policy classes for these policies."

28.    The State of Wisconsin also found the 2010 COI Increase to be unlawful.  In an action brought by the Office of the Commissioner of Insurance for the State of Wisconsin, Wisconsin's Administrative Law Court granted summary judgement in favor of the state on October 16, 2014, finding the increase to be unlawful and Phoenix's marketing materials to be deceptive.

29.    The second COI rate increase was announced in late 2011 and was effective on policy anniversary dates starting on November 1, 2011 (the "2011 COI Increase").  The 2011 COI Increase applied to PAUL IIIa, IIIb, and IIIc policies, but again only a certain subset certain subset of policyholders — for PAUL IIIa, it was policies of issue ages 68 and higher with a face amount of $1 million or higher; for PAUL IIIb and IIIc it was policies issues ages 65 and higher with a face amount of $1 million or higher.  Policyholders were not given the choice of increasing their accumulated policy value to avoid the increase; each affected policyholder had

to pay more than they otherwise would have paid before the second COI rate increase was announced. But the second COI increase was very much a continuation of the first; the primary difference was Phoenix had learned through its encounter with the NYDFS not to explicitly admit it was changing COI rates based on funding ratios.

30.    A class action lawsuit was filed against Phoenix NY in the United States District Court for the Southern District of New York on November 18, 2011, alleging that both the 2010 COI Increase and the 2011 COI Increase were unlawful. A class was certified on July 12, 2013, *see Fleisher, et al. v. Phoenix Life Ins. Co.*, Case No. 11 Civ. 8405 (CM), 2013 WL 12224042 (S.D.N.Y. July 12, 2013),[2] and Phoenix was later separately sued, *see SPRR LLC v. PHL Variable Ins. Co.*, Case No. 14 Civ. 8714 (CM) (S.D.N.Y). These 2 cases settled in 2015 for monetary and non-monetary relief of over $130 million. The releases in those cases were limited to the 2010 and 2011 COI Increases, and made clear that the release excluded any future COI rate adjustments, like the 2017 COI Increases, assessed by Phoenix or Phoenix NY. Also included in the prospective relief was a commitment not to raise COI rates on members of the settlement class until at least December 31, 2020.

31.    Phoenix has privately agreed with a subset of policyholders, mostly large financial institutions, that, in the event that Phoenix raises COI rates at any point in the future (including the 2017 COI Increase and beyond December 31, 2020), Phoenix will *rebate* the amount of increases to those policyholders.

---

[2] The Court in *Phoenix I* initially certified two classes, one involving the 2010 COI increase and another involving the 2011 COI increase. The Court subsequently decertified the 2010 class because it was "mistaken in [its] understanding of the scope of the class," as it consisted of three subclasses, one of which "could be certified as a class" but had no class representative and the remaining two subclasses totaled less than 30 policies and were unable to satisfy, *inter alia*, numerosity. *Fleisher v. Phoenix Life Ins. Co.*, 2013 WL 4573530 (S.D.N.Y. Aug. 26, 2013). The Court held that this decision "has no impact on the certification of the 2011 Class." *Id.* at *4. The Court then conditionally re-certified the 2010 class as part of the settlement class. *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *3 (S.D.N.Y. Sept. 9, 2015).

32.    When an insurer raises COI rates significantly—or even announces such an increase—it triggers what are known as "shock lapses" by policyholders.  In response to the 2011 COI Increase, roughly 25% of New York policies lapsed. Applied across Phoenix's portfolio, this equates to billions in avoided death benefits and the elimination of thousands of unprofitable policies.  The avoided death benefits, in turn, allowed Phoenix to release reserves and provide it additional liquidity.  From October 2011 to December 2014, the stock price of Phoenix's parent company, The Phoenix Companies, Inc., rose from $23.00 a share to $69.00 a share.

C.    **Nassau Re Acquisition**

33.    Phoenix, however, had other problems: its financial reporting and internal controls were as problematic as its approach to COI redeterminations. Notably, many of Phoenix's problems concerned its accounting for the PAUL policies at issue in this litigation. Specifically, Phoenix had intentionally priced PAUL policies so that they would be very profitable in early years and unprofitable in later years. This front-loading of profits is not uncommon with universal life insurance products: insurers typically expect to "break-even" within seven years of policy issuance, and sometimes even within two years.  Yet it also means that, in later years, the insurer must absorb the losses, as it cannot raise COI rates in order to increase profitability.  Rather, it is bound by the profitability (or unprofitability) that it assumed at pricing.

34.    On September 18, 2012, Phoenix announced that its previously-issued audited financial statements for the years ended December 31, 2011, 2010, and 2009 could no longer be relied upon and should be restated, along with the unaudited financial statements for the quarterly periods dating back to March 31, 2011. Phoenix disclosed that certain errors were

identified "primarily related to the accounting for an intercompany reinsurance treaty" between Phoenix and Phoenix NY, and that these errors concerned "ceded premiums and certain periodic adjustments to receivables, deferred acquisition costs, and liability for policyholder benefits."

35.    Phoenix's publicly-traded parent company, The Phoenix Companies, Inc. ("TPC"), subsequently announced that that its audited financial statements could no longer be relied upon and would be restated.  TPC listed two principal error categories including incorrect classification of deposits and withdrawals of universal life and variable life products and the incorrect reporting of certain fees and interest charges as cash flows provided by financing activities.  TPC also warned that "[m]anagement will likely conclude that there are one or more material weaknesses" in its disclosure controls and procedures and internal controls over financial reporting.  TPC stated that it expected to file restated financial statements prior to the timely filing of its 2012 Annual Report on Form 10-K in March 2013.  It did not do so, and in fact stopped filing new financial statements.

36.    On March 21, 2014, the SEC instituted cease-and-desist proceedings against both Phoenix and TPC for failure to timely file financial statements.  Phoenix and TPC voluntarily entered into a settlement with the SEC pursuant to which they committed to filing the delinquent financial reports by dates certain and were each fined $375,000. *See The Phoenix Companies, Inc. and PHL Variable Insurance Company*, Exchange Act Release No. 71768 (Mar. 21, 2014). After Phoenix was unable to meet certain of the deadlines imposed in the undertakings, the SEC amended its March 21, 2014 order by extending the undertakings deadlines to December 2014 and imposing additional penalties, including increasing penalties should Phoenix further delay its filings. *See The Phoenix Companies, Inc. and PHL Variable Insurance Company*, Exchange Act Release No. 72738 (Aug. 1, 2014).

37.    On April 1, 2014, TPC filed its Form 10-K for the year ended December 31, 2012, and in this filing it restated and amended its consolidated financial statements for the years ended December 31, 2011 and 2010.  There were several categories of identified errors in the restated Form 10-K.  The most significant errors concerned Phoenix's accounting for PAUL policies.  As recounted in the SEC's July 15, 2016 Cease-and-Desist Order, "[a] PAUL policy was designed as a traditional universal life policy, but would generate higher COI fees in the early years, and lower COI fees in the later years… Phoenix determined that, ***by design***, the COI feature of the PAUL policies, the secondary guarantees of the SGUL policies, and the Extended Life Rider all were expected to result in profits in earlier years and ***subsequent losses in later years***."

38.    Despite projecting these losses at the time it priced the PAUL policies, Phoenix decided that this did not qualify as a "benefit feature" and it did not record this liability.  When it was finally forced to correct its financials, this error increased liabilities by $179.4 million, decreased stockholder's equity by $122.1 million, and reduced net income by $34 million for the 2011 fiscal year.  For the 2010 fiscal year, this error decreased net income by $46.7 million, which represented 106% of TPC's reported income from continuing operations before income taxes. This error had, by far, the largest impact on TPC's 2010 and 2011 financials.  TPC was fined $600,000.00.

39.    In September 2015, while the SEC investigation was pending, TPC announced that it was being acquired and taken private by Nassau Re, a private equity firm. The purchase price was $217.2 million, with a commitment by Nassau Re to contribute an additional $100 million in equity upon closing.  The acquisition closed on June 20, 2016.  At the time of closing,

Nassau Re's CEO stated that "[o]ur immediate priorities are to bolster Phoenix's ratings and risk-based capital ratios while improving the company's profitability."

40.    A mere 14 months later, Phoenix announced the 2017 COI Increase, which impacts the same PAUL policies that were deliberately priced to be unprofitable in later years.

**D.    Phoenix's Unlawful 2017 COI Increase**

41.    On or about August 21, 2017, Phoenix sent letters to policyholders notifying them of a new COI increase.  The letters did not state the amount of the increase, stating only that "[t]here will be an overall increase to cost of insurance rates, as well as progressive increases to cost of insurance rates beginning when an insured reaches age 71 through age 85."  The letters also did not state the justification for the increase, aside from a generic statement that "certain experience factors are now less favorable than we anticipated when we established the cost of insurance rate schedule."

42.    Some policyholders received notice that the "[a]djustments to cost of insurance rates could impact you on your policy anniversary following November 5, 2017."  The letters disingenuously state that "[w]e wanted to let you know about the change as soon as possible, so that you have the opportunity to review your policy and contact our customer service representatives with any questions," while simultaneously stating that illustrations will not be available until November 6, 2017.

43.    Policyholders that were part of the *Phoenix I* settlement class received the same letter except that rather than taking effect the first policy anniversary following November 5, 2017, the letter stated that "[i]n compliance with the terms of a prior settlement agreement, we will not impose any cost of insurance rate adjustment with respect to your policy until after December 31, 2020." Other than the difference in start date for the increase, the letters sent to all

policyholders victimized by the 2017 COI increase were the same. Regardless of what type of policy they held, all policyholders were told, in the same form letter dated on the same day, that Phoenix is "adjusting the cost of insurance rates on certain Phoenix Accumulator Universal Life and Phoenix Estate Legacy policies."

44.    Despite this limited information, it is clear that the 2017 COI Increase violates the terms of the Subject Policies in at least four ways. ***First***, the 2017 COI Increase discriminates unfairly within a class of insureds, specifically by attained age. As discussed, there is no "age 71 to 85" class, and there are no separate classes for each of age 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, and 85. Any redetermination must be conducted on a class basis and Phoenix is not permitted to redefine the meaning of "class" at its convenience. And even if Phoenix were to now contend that granular classes were appropriate, Phoenix would still be in breach, as it did not redetermine separately by risk classification or gender—only age. Phoenix's increase is particularly problematic inasmuch as it targets insureds of policies who have reached older ages where it is unlikely that they will be able to find substitute coverage.

45.    ***Second***, the 2017 COI Increase discriminates within a class of insureds based on whether they were subjected to the 2010 and 2011 increases and the terms of various side-agreements reached with Phoenix. Phoenix has imposed the increase effective November 5, 2017 for some policyholders, delayed implementation of the increase until December 31, 2020 for others, and—through the use of rebates—permanently suspended the increase for others. This is impermissible.

46.    There is no actuarial basis for treating these groups of policyholders differently and they do not belong to different classes. Like a most favored nation clause, the purpose of the uniformity requirement is that everyone in the same class of insureds gets the same deal,

regardless of bargaining position or financial resources. This well-established insurance principle is enshrined in not only the policy but many states' laws.

47. **Third**, the 2017 COI Increase is not based on the enumerated factors. Mortality is the biggest driver of COI rates and it has not deteriorated. Rather, mortality rates have improved steadily each year. That is, mortality risks have only gotten better over time, as people are living much longer than anticipated when the products were priced and issued.

48. Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A mortality table is a chart showing the rate of death at a certain age.

49. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced the 2001 CSO Mortality Table, which showed strong mortality improvements, particularly at older ages, over the 1980 CSO table. The Society of Actuaries is currently investigating an update of the CSO tables with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

50. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90.

51.    Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table.

52.    The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint.   The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables and the 1975-80 Basic Tables, demonstrating that mortality experience has continued to improve substantially and consistently.   That trend continues.   In 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

53.    The trend of improving mortality is even more pronounced for the older age insureds affected by the 2017 COI increase.   In particular, the 2008 Valuation Basic Table showed an improvement for older age mortality as compared to prior tables commonly used at the time the Subject Policies were priced, and the trend in improving mortality for older ages continued with the introduction of the 2015 Valuation Basic Table.

54.    Nor do any of the other enumerated factors justify the 2017 COI Increase.   That the 2017 COI Increase is specifically targeted at older policyholders, with progressive increases from 71 to 85, disproves that it is based on investment earnings.   Phoenix cannot reasonably assume that insureds aged 70 would have different investment earnings experience than an insureds aged 71, nor can it reasonably assume that insureds aged 73 would have different

investment experience than insureds aged 72.  Phoenix does not make investment decisions on an attained age basis—the money for investments is all pooled together, and the performance of those investments does not depend on the age of any particular policyholder or subset of policyholders.  Furthermore, interest rates and investment earnings have improved since the pricing reset in 2011; for example, 5-year treasury yields were approximately 1% in Q4 of 2011, since when they have roughly doubled to 2% by the end of 2016. Similarly, expenses and taxes do not materially vary with age.  Notably, Phoenix just had its corporate tax rate cut from 35% to 21%, yet four months later it has still not made any indication that it will be reducing rates.

55.    The 2011 COI Increase was designed to be a reset for all the pricing assumptions for affected policies. At that time, and up through at least 2016, Phoenix issued illustrations for all products hit by the 2017 COI Increase, and these illustrations, by law, represented that Phoenix's current assumptions were not more favorable to the policyholder than the assumptions used to price the illustrated non-guaranteed COI rates (i.e., the pre-2017-increase COI rate scale). Since then the key drivers of pricing such as mortality, investment earnings and tax rates have all improved. Despite these improvements, the 2017 COI Increase has raised cost of insurance rates by at least up to 20%—a massive increase that is totally out of line with any possible change in the enumerated factors since 2011.

56.    **Fourth**, the true reason for the 2017 COI Increase is to increase profits, recoup past losses, and earn a return on Nassau Re's investment.  This is prohibited by both the terms of the Subject Policies and actuarial standards. The Subject Policies expressly prohibit the recoupment of past losses, and profits are not one of the enumerated factors upon which a COI increase can be based. As confirmed in the SEC proceedings, the Subject Policies were intentionally designed to be highly profitable in early years and incur losses in later years.

20

Phoenix reaped those profits: in 2008, when many of the Subject Policies were sold, TPC's stock price was soaring at $264.24 per share. There is no legal way for Phoenix to now make them profitable in later years.

57.    Notably, one of the first things that NYDFS does when assessing the permissibility of a COI increase is demand a comparison of original profit expectations to post-increase profit expectations. Here, Nassau Re dodged this scrutiny by implementing the 2017 COI Increase at Phoenix but not at Phoenix NY, despite that fact that both companies sell the same PAUL and PEL policies and they were priced on the same basis. If the COI increase was actuarially justified, Phoenix NY would have implemented it. That it did not underscores the problems described herein.

58.    Some of the increases in COI are at least as large as 20%. The COI rates were reset in 2011 for many of the policies at issue (and as recently as 2014 for some). Between 2011 and at least 2016, Phoenix sent illustrations to policyholders representing that Phoenix's then-current assumptions did not warrant an increase in COI rates above the then-current COI rates contained in the illustrations. Then Phoenix abruptly raised COI rates in 2017. Such increases cannot be prospective. None of the key elements of policy pricing, as explained in the enumerated factors of the policies (such as mortality, investment earnings, taxes) has deteriorated at all in the past 6 years, let alone worsened enough to warrant a 20% increase. This increase will therefore raise the profitability of the book compared to forecasts made at the time of resetting the COI rates or issuing the policies.

59.    The announcement of the 2017 COI Increase caused immediate injury to Plaintiff and all owners of the Subject Policies. First, it immediately devalued their policies. Like other assets, every life insurance policy has a value. The value of life insurance is the product of the

discounted value of projected future costs and discounted value of projected future returns.  By announcing a COI increase, Phoenix increased those projected costs, which has an immediate negative impact on the present value of policies. This value exists regardless of whether the policy is owned for estate planning or investment purposes.  Second, policyholders must decide *now* what to do in response to the increase: continue funding their policies at the current rate, increase the amount funded, lapse, surrender, or to seek alternative life insurance coverage.  Any premiums paid currently will be lost if the policy lapses or becomes uneconomical.  Plaintiff and the Phoenix COI Class have therefore already been injured by Phoenix's breach.

## CLASS ACTION ALLEGATIONS

60.    This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class—referred to herein as the "Phoenix COI Increase Class"—consists of:

> All owners of PAUL and PEL policies issued by PHL Variable Insurance Company that were notified on or after August 1, 2017 that they would be subject to a cost of insurance rate increase (excluding defendant PHL Variable Insurance Company, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

Plaintiff reserves the right to define additional subclasses at the class certification stage.

61.    The Phoenix COI Increase Class consists of thousands of policyholders and is thus so numerous that joinder of all members is impracticable.  The identities and addresses of class members can be readily ascertained from business records maintained by Phoenix.

62.    The claims asserted by Plaintiff are typical of the claims of the Phoenix COI Increase Class.

63.    Plaintiff will fairly and adequately protect the interests of the Phoenix COI Increase Class and does not have any interests antagonistic to those of the other members of this class.

64.    Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

65.    Plaintiff request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

66.    This action is appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Phoenix has acted on grounds that apply generally to the class, such that final injunctive and/or declaratory relief is appropriate.    Appropriate declaratory and/or injunctive relief includes, but is not limited to:

(a)    declaring the 2017 COI Increase to be unlawful;

(b)    declaring the announcement of the 2017 COI Increase to constitute an anticipatory breach of contract that excuses subsequent performance;

(c)    prohibiting the continuing implementation of the 2017 COI Increase;

(d)    declaring the conditions and rules under which future redeterminations may be conducted; and

(e)    ordering the reinstatement of policies that have lapsed or been surrendered following Phoenix's anticipatory breach of contract.

67.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over those questions affecting only individual members. Those common questions include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Phoenix has breached and/or anticipatorily breached its contracts with the class members;

(c)     whether Phoenix has violated the implied covenant of good faith and fair dealing;

(d)     whether Plaintiff and Class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages; and

(e)     whether Plaintiff and Class members are entitled to declaratory relief, injunctive relief, and/or specific performance.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when Phoenix's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)    without a class action, many class members would continue to suffer injury, and Phoenix's violations of law will continue without redress while Phoenix continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on behalf of Plaintiff and the Phoenix COI Increase Class)

69.    Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth therein.

70.    The Subject Policies are binding and enforceable contracts.

71.    Phoenix materially breached the policies in several respects, including but not limited to the following:

(a)    The 2017 COI Increase breached the prohibition on unfair discrimination within a class of insureds and the uniformity requirement;

(b)    The 2017 COI Increase breached the policies by determining COI rates based on factors not enumerated in the policies;

(c)    The 2017 COI Increase breached the policies because it increases profits and recoups prior losses in violation of the terms of the policies and the implied covenant of good faith and fair dealing; and

(d)    The 2017 COI Increase was not conducted in good faith or on a class basis, was not based on actuarially reasonable assumptions, was not calculated through an actuarially reasonable methodology, and was designed to induce lapses, all in violation of the policies and the implied covenant of good faith and fair dealing.

72.    In the event that any breach alleged herein is not explicitly covered by the terms of the contract, Phoenix has breached the covenant of good faith and fair dealing by the conduct alleged above.

73.    In the event that any breach alleged herein has not yet occurred, Phoenix has committed anticipatory breach by unequivocally declaring its intent to breach the terms of the policies.

74.    Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by Phoenix's conduct as set forth herein.

75.    As a direct and proximate cause of Phoenix's material breaches of the policies, Plaintiff and the Phoenix COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief (on behalf of Plaintiff and the Phoenix COI Increase Class)

76.    Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

77.    An actual controversy now exists between Plaintiff and the Phoenix COI Increase Class, on one hand, and Phoenix, on the other hand, concerning the respective rights and duties of the parties under the Subject Policies.  Phoenix contends that it lawfully and appropriately increased COI rates and is entitled to deduct these amounts from policy accounts.  Plaintiff and the Phoenix COI Class contend that this COI increase is unlawful and constitutes a material breach of the express and implied terms of the Subject Policies.

78.    Further, this is the third unlawful COI increase that Phoenix has attempted to impose on certain of the Subject Policies in the span of seven years.  These disputes are bound to

reoccur in the absence of declaratory relief: (a) declaring the rights of the parties with respect to the 2017 COI Increase and (b) defining the terms under which any future COI increase must be conducted.  Plaintiff hereby requests such declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

79.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

80.    Awarding Plaintiff and the Phoenix COI Increase Class compensatory damages, consequential damages, restitution, disgorgement, and any other relief permitted by law or equity;

81.    Awarding Plaintiff and the Phoenix COI Increase Class pre-judgment and post-judgment interest, as well as costs;

82.    Awarding injunctive relief, declaratory relief and/or specific performance including, but not limited, to the following:

(a)  declaring the 2017 COI Increase to be unlawful;

(b)  declaring that the announcement of the 2017 COI Increase constituted a material anticipatory breach of the Subject Policies;

(c)  ordering Phoenix to reinstate any lapsed or surrendered policies;

(d)  enjoining the 2017 COI Increase; and

(e)  declaring the terms under which future redeterminations may be conducted, including but not limited to what policy classes may be used.

83.    Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: April 19, 2018


/s/ Seth Ard
Seth Ard
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
sard@susmangodfrey.com


Steven G. Sklaver (pro hac vice to follow)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com

Attorneys for Plaintiff